**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
--------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Plaintiff,

v.

                              **DEMAND FOR JURY TRIAL**

JAMES PADULA, D.O.,
JOHN MAFFIA,
ALBERT JEROME, D.C.,
ELIAS GOLDSTEIN, D.C.,
MUSTAFA M. SHUKR, M.D.,
TESSY C. JENKINS, M.D.,
GEORGE W. IBRAHEIM, D.O.,
FRANCES S. MADDEN, M.D.,
PAVAN TANKHA, D.O.,
MICHIGAN PAIN MANAGEMENT, P.L.L.C.,
DEARBORN PAIN SPECIALISTS, P.L.L.C.,
STERLING HEIGHTS PAIN MANAGEMENT, P.L.C.,
and
LABORATORY SPECIALISTS OF MICHIGAN, L.L.C.

      Defendants.
--------------------------------------------------------x

## <u>COMPLAINT</u>

State Farm Mutual Automobile Insurance Company ("State Farm Mutual"),

for its complaint against defendants James Padula, D.O. ("Padula"), John Maffia,

("Maffia"), Albert Jerome, D.C. ("Jerome"), Elias Goldstein, D.C. ("Goldstein"),

Mustafa M. Shukr, M.D. ("Shukr"), Tessy C. Jenkins, M.D. ("Jenkins"), George W.

Ibraheim, D.O. ("Ibraheim"), Frances S. Madden, M.D. ("Madden"), Pavan Tankha, D.O. ("Tankha"), Michigan Pain Management, P.L.L.C. ("Michigan Pain Management"), Dearborn Pain Specialists, P.L.L.C., ("Dearborn Pain Specialists"), Sterling Heights Pain Management, P.L.C. ("Sterling Heights Pain Management"), and Laboratory Specialists of Michigan, L.L.C. ("Laboratory Specialists of Michigan") (collectively "Defendants"), alleges as follows:

## I.      NATURE OF THE ACTION

1.      This action involves Defendants' scheme to fraudulently obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation for services purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services are either not performed or are performed regardless of whether they may be medically necessary.  Instead, the services are recommended and performed, if performed at all, to enrich Defendants, without regard to the unique needs of any patient.

2.      The scheme is principally driven by Maffia, Florida chiropractors Goldstein and Jerome, and Florida physician Padula (collectively, "the Management Group"), who own and/or control a series of medical practices in Michigan, including Michigan Pain Management, Sterling Heights Pain

2

Management, and Dearborn Pain Specialists (collectively, the "Clinic Defendants"), as well as Laboratory Specialists of Michigan, a clinical lab performing urine drug tests ("UDTs") primarily for medical practices owned and/or controlled by the Management Group.

3.      By 2018, Defendants were referring patients for highly lucrative diagnostic tests, namely electroencephalograms ("EEGs") and UDTs (collectively, "Diagnostic Tests"). Defendants did not make these referrals based on a legitimate evaluation of the individual medical needs of the patients. Instead, Defendants routinely sent patients for Diagnostic Tests, regardless of medical necessity, in order to ensure a steady stream of profits.

4.      By then, Maffia, Goldstein, and Jerome (collectively, "the Florida Managers") had formed the Clinic Defendants (first, Michigan Pain Management, followed by Sterling Heights Pain Management and Dearborn Pain Specialists) to take advantage of Michigan's unique claims environment and target individuals involved in automobile accidents and eligible for No-Fault Benefits. Specifically, the Florida Managers sought to capitalize on the benefits available through Michigan's No-Fault Act, which at the time required private passenger automobile insurance companies to provide unlimited No-Fault Benefits for life, if all conditions of eligibility were met.

5.     To operate a medical practice in Michigan, the Florida Managers needed to find physicians willing to evaluate patients and refer the patients back to the Clinic Defendants for additional highly lucrative – but medically unnecessary – Diagnostic Tests.

6.     The Florida Managers first recruited Padula, a Florida physician treating patients at Jerome's Florida chiropractic practice.   By 2018, the Management Group had successfully recruited other physicians, including defendants Madden, Ibraheim, Tankha, and Shukr (the "Physicians"), to participate in the fraudulent scheme by making unnecessary referrals to patients.

7.     The fraud scheme was created and implemented by the Management Group and is carried out at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists through referrals made by the Physicians.

8.     First, Defendants prescribe and bill for 72-hour ambulatory EEGs regardless of medical necessity.  Defendants prescribed these for at least 60 patients. EEGs are used by neurologists to detect abnormalities in the electrical activity of the brain for patients experiencing unusual neurological symptoms, such as seizures or loss of consciousness.  They are not indicated for patients with soft-tissue injuries experiencing pain in their back, neck, or head, and it would be highly unusual for a legitimate medical provider to prescribe even a single resting EEG for patients with

4

soft tissue injuries, much less a 72-hour battery of testing. Nonetheless, despite having no background or training in neurology, the Physicians typically refer patients with no true clinical indications requiring an EEG for medically unnecessary 72-hour ambulatory EEGs. Incredibly, Michigan Pain Management and Dearborn Pain Specialists charge *almost $30,000* for each patient who receives these medically unnecessary EEGs.

9. Second, to further increase profits and exploit patients' No-Fault Benefits, the Management Group opened Laboratory Specialists of Michigan in 2018. At Padula's direction, the Physicians began referring, and continue to refer, patients from the Clinic Defendants to Laboratory Specialists of Michigan for UDTs, regardless of their medical necessity. Since Laboratory Specialists of Michigan began performing UDTs, the Clinic Defendants have sent at least 70 percent of their patients eligible for State Farm Mutual No-Fault Benefits to Laboratory Specialists of Michigan for UDTs.

10. The referrals, performance, and/or administration for Diagnostic Tests described above were not, and are not, made to provide patients with relief for their unique medical conditions. Rather than seeking to provide legitimate medical care for patients, Defendants make, or cause others to make, these referrals to enrich Defendants, without regard to either the medical necessity or the medical efficacy of the procedures.

5

11.     As noted above, while the scheme is principally driven by the Management Group, each defendant plays a critical role in the scheme.  To facilitate their scheme, the Physicians: (a) refer patients for costly Diagnostic Tests, regardless of whether they are medically necessary; (b) prepare fraudulent examination reports that are submitted to insurance companies as justification for the referrals and charges for the Diagnostic Tests; and (c) prepare fraudulent diagnostic reports – which are also submitted to insurance companies – purporting to reflect that patients received the Diagnostic Tests.  The Clinic Defendants and Laboratory Specialists of Michigan submit charges for these services with the documentation created by the Clinic Defendants, which is used to purportedly justify the medical necessity and exorbitant charges for the Diagnostic Tests.

12.     Because the above-described Diagnostic Tests are not provided because they are medically necessary to address the unique needs of the patients, the bills and supporting documentation submitted to State Farm Mutual for those services are fraudulent, and the charges for those Diagnostic Tests are not owed.  The bills for the UDTs referred to Laboratory Specialists of Michigan are also fraudulent because these UDTs were the product of Defendants' conduct in violation of Michigan's prohibition against self-referrals.

13.     This action seeks a declaratory judgment that State Farm Mutual is not liable for any pending bills or bills that the Clinic Defendants and Laboratory

6

Specialists of Michigan have submitted, and caused to be submitted, to date and through the trial of this case based upon the above-described conduct.  This action also asserts statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO") as well as common law claims for fraud and unjust enrichment, to recover actual damages of more than $450,000 in No-Fault Benefits paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.

14.     State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.     JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 *et seq*. because they arise under the laws of the United States.

16.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over all claims because they are so related to the claims over which it has original jurisdiction that they form part of the same case or controversy.

17.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.   PARTIES

### A.   Plaintiff

18.     State Farm Mutual is a citizen of Illinois.  It is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it has been licensed in Michigan to engage in the business of insurance.

### B.   Defendants

#### 1.   The Medical Clinics

##### a)   Michigan Pain Management, P.L.L.C.

19.     Michigan Pain Management is a medical practice in Michigan that purports to provide pain management services.

20.     Its principal place of business is at 30301 Woodward Ave., Royal Oak, Michigan 48073.

21.     Michigan Pain Management was initially incorporated in Florida on February 25, 2014 by Florida chiropractor Jerome.  Its articles of incorporation identified Jerome, Goldstein, Maffia, and Padula as the managers.  The address listed in the articles of incorporation for all of the managers was 4676 Okeechobee Blvd,

8

West Palm Beach, Florida 33417, which is also the address of Comprehensive Health Care Systems of the Palm Beaches, a chiropractic practice co-owned by Jerome.

22.     On March 27, 2014, Jerome incorporated Michigan Pain Management as a Michigan professional limited liability company.  The articles of organization submitted to the state of Michigan were faxed from Comprehensive Health Care Systems, which is co-owned by Jerome.

23.     In Michigan Pain Management's 2015 Annual Report and Annual Statement with the Michigan Department of Licensing and Regulatory Affairs, Jerome and Padula were both identified as members.  And as of May 2023, the registered office mailing address is 525 S. Flagler Drive, 19B, West Palm Beach, Florida 33401, an address which Jerome and Goldstein have used for other companies.

24.     Padula has testified that he is currently the sole owner and member of Michigan Pain Management.  Padula has further testified that he is only in Michigan 6 to 8 days a month, and he has relied on management companies owned by the Florida Managers to operate his practices.

25.     Because Padula is a citizen of Florida, Michigan Pain Management is a citizen of Florida.

26. From approximately October 2017 through October 2019, Michigan Pain Management has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for ambulatory EEGs purportedly performed by Jenkins. *See* Ex. 1. Furthermore, at the direction of Padula, from at least 2018 through the present, the Physicians have referred patients from Michigan Pain Management to Laboratory Specialists of Michigan for UDTs, regardless of whether they were medically necessary and in violation of Michigan's prohibition against self-referrals. *See* Ex. 2.

### b) Dearborn Pain Specialists, P.L.L.C.

27. Dearborn Pain Specialists is a medical practice in Michigan that purports to provide pain management services.

28. On October 11, 2016, Padula incorporated Dearborn Pain Specialists, and it is a professional limited liability company.

29. Its principal place of business is in an office suite at Advanced Surgery Center, located at 13530 Michigan Ave, Dearborn, Michigan 48126.

30. Padula has testified that he is the sole owner and member of Dearborn Pain Specialists. Padula has further testified that he has relied on management companies owned by the Florida Managers to operate his practices.

31. Because Padula is a citizen of Florida, Dearborn Pain Specialists is a citizen of Florida.

10

32.    From approximately November 2017 through March 2020, Dearborn Pain Specialists has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for ambulatory EEGs purportedly performed by Jenkins. *See* Ex. 1. Furthermore, at the direction of Padula, from at least 2018 through the present, the Physicians have referred patients at Dearborn Pain Specialists to Laboratory Specialists of Michigan for UDTs, regardless of whether they were medically necessary and in violation of Michigan's prohibition against self-referrals. *See* Ex. 2.

### c)    Sterling Heights Pain Management, P.L.C.

33.    Sterling Heights Pain Management is a medical practice in Michigan that purports to provide pain management services.

34.    In December 2016, Padula incorporated Sterling Heights Pain Management as a Michigan professional limited liability company.

35.    Its principal place of business is at 2311 15 Mile Rd., Sterling Heights, MI 48310.

36.    Padula has testified that he is the sole owner and member of Sterling Heights Pain Management.

37.    Because Padula is a citizen of Florida, Sterling Heights Pain Management is a citizen of Florida.

11

38.     From approximately August 2018 through April 2019, Sterling Heights Pain Management knowingly submitted, and caused to be submitted, bills and supporting documentation that were fraudulent for ambulatory EEGs purportedly performed by Jenkins.  *See* Ex. 1.  Furthermore, at the direction of Padula, from approximately October 2018 through the present, the Physicians have referred patients at Sterling Heights Pain Management to Laboratory Specialists of Michigan for UDTs, regardless of whether they were medically necessary and in violation of Michigan's prohibition against self-referrals.  *See* Ex. 2.

### 2.     The Toxicology Company

#### a)     Laboratory Specialists of Michigan, L.L.C.

39.     Laboratory Specialists of Michigan is a clinical lab that performs UDTs.

40.     Laboratory Specialists of Michigan was incorporated as a Michigan limited liability company in April of 2018.

41.     Its principal place of business is at 13530 Michigan Ave., Dearborn, Michigan 48126.

42.     According to testimony from Padula, Laboratory Specialists of Michigan is owned by Maffia, Padula, and Arthur Schnur ("Schnur").  Schnur is a citizen of Florida.  Because Maffia is a citizen of Michigan and Padula and Schnur

are citizens of Florida, Laboratory Specialists of Michigan is a citizen of Michigan and Florida.

43.     Laboratory Specialists of Michigan submitted charges for presumptive and confirmatory UDTs for patients of the Clinic Defendants, pursuant to referrals from the Physicians.   Collectively, the Clinic Defendants provided Laboratory Specialists of Michigan with the majority of its referrals.

44.     From approximately September 2018 through the present, Laboratory Specialists of Michigan has knowingly submitted, and caused to be submitted, bills and supporting documentation that are fraudulent for more than 950 UDTs.  *See* Ex.2.  These bills and the supporting documentation were fraudulent and were not owed because: (1) patients were not referred for these services because they were medically necessary; and (2) the UDTs were rendered in violation of Michigan's prohibition against self-referrals.

### 3.     The Management Group

#### a)     James Padula, D.O.

45.     Padula is a resident and citizen of the state of Florida.

46.     Padula has been licensed to practice medicine in Michigan since November 2013.

47.     To facilitate his scheme, Padula has owned and/or controlled a network of medical practices in Michigan, including Michigan Pain Management, Sterling

Heights Pain Management, Dearborn Pain Specialists, as well as Laboratory Specialists of Michigan, which target patients who have been in auto accidents and are eligible for No-Fault Benefits. Padula was the sole treating physician when Michigan Pain Management opened. At his direction, since 2018, the Physicians have been referring patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists to Laboratory Specialists of Michigan for UDTs, regardless of medical necessity and in violation of Michigan's prohibition against self-referrals.

48.    From approximately 2017 through the present, Padula has knowingly submitted and/or caused to be submitted fraudulent bills and supporting documentation from: (a) Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs purportedly performed by Jenkins; and (b) Laboratory Specialists of Michigan for UDTs performed for patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### b)    John Maffia

49.    Maffia is a resident and citizen of the state of Michigan.

50.    Maffia is a member of JE Management, LLC and Michigan Management LLC, which own and/or control Michigan Pain Management and Dearborn Pain Specialists.

14

51.     To facilitate his scheme, Maffia recruited the Physicians to provide services at the Clinic Defendants and has owned and/or controlled a network of medical practices in Michigan, including Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists, which target patients who have been in auto accidents and are eligible for No-Fault Benefits.  Both Jenkins and Shukr testified that Maffia recruited them.   Shukr further testified that Maffia manages the Clinic Defendants.

52.     To further facilitate the growth of the fraud scheme, Maffia also: (a) set up the ambulatory EEGs for the Clinic Defendants; and (b) created and co-owns Laboratory Specialists of Michigan, which also targets patients who have been in auto accidents and are eligible for No-Fault Benefits.

53.     From approximately 2017 through the present, Maffia has knowingly submitted and/or caused to be submitted fraudulent bills and supporting documentation from: (a) Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs purportedly performed by Jenkins; and (b) Laboratory Specialists of Michigan for UDTs performed for patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### c)     Albert Jerome, D.C.

54.     Jerome is a resident and citizen of the state of Florida.

55. To facilitate his scheme, Jerome incorporated Michigan Pain Management in Michigan and Florida. He also recruited the Physicians, including Padula, to provide services at the Clinic Defendants and has owned and/or controlled a network of medical practices in Michigan, including Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists, which target patients who have been in auto accidents and are eligible for No-Fault Benefits.

56. From approximately 2017 through the present, Jerome has knowingly submitted and/or caused to be submitted fraudulent bills and supporting documentation from: (a) Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs purportedly performed by Jenkins; and (b) Laboratory Specialists of Michigan for UDTs performed for patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### d) Elias Goldstein, D.C.

57. Goldstein is a resident and citizen of the state of Michigan.

58. To facilitate his scheme, Goldstein recruited the Physicians to provide services at the Clinic Defendants and has owned and/or controlled a network of medical practices in Michigan, including Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists, which target patients who have been in auto accidents and are eligible for No-Fault Benefits. Goldstein

regularly monitored the Facebook activity of Michigan Pain Management, "liking" posts (including a post marketing devices used by the Clinic Defendants) and writing a review of Michigan Pain Management.

59.     From approximately 2017 through the present, Goldstein has knowingly submitted and/or caused to be submitted fraudulent bills and supporting documentation from: (a) Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs purportedly performed by Jenkins; and (b) Laboratory Specialists of Michigan for UDTs performed for patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### 4.     The Physicians

#### a)     Frances S. Madden, M.D.

60.     Madden is a resident and citizen of the state of Michigan

61.     Madden became a licensed physician in Michigan in 2001, but allowed her license to lapse in 2020.

62.     Madden treated patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

63.     From approximately October 2017 through April 2019, Madden knowingly submitted, or caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Michigan Pain Management, Sterling

Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs; and (b) Laboratory Specialists of Michigan for UDTs provided to patients at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### b)    Mustafa M. Shukr, M.D.,

64.    Shukr is a resident and citizen of the state of Michigan.

65.    Shukr has been a licensed physician in Michigan since 2017.

66.    Shukr treated patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

67.    Shukr testified that he was recruited to work for the Clinic Defendants by Maffia.

68.    From approximately June 2018 through the present, Shukr has knowingly submitted, or caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs; and (b) Laboratory Specialists of Michigan for UDTs provided to patients at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### c)    George W. Ibraheim, D.O.

69.    Ibraheim is a resident and citizen of the state of Florida.

70.    Ibraheim has been a licensed physician in Michigan since 2016.

71.    Ibraheim treats patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

72.    Ibraheim had worked with Padula in Florida and was recruited by Padula.

73.    From approximately September 2018 through the 2020, Ibraheim has knowingly submitted, or caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Michigan Pain Management, Sterling Heights Pain Management and Dearborn Pain Specialists for ambulatory EEGs; and (b) Laboratory Specialists of Michigan for UDTs provided to patients at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### d)    Pavan Tankha, D.O.

74.    Tankha is a resident and citizen of the state of Michigan.

75.    Tankha has been a licensed physician in Michigan since 2018.

76.    Tankha treated patients of Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

77.     From approximately September 2018 through August 2019, Tankha knowingly submitted, or caused to be submitted, bills and supporting documentation that are fraudulent from: (a) Michigan Pain Management, Sterling Heights Pain Management, Dearborn Pain Specialists for ambulatory EEGs; and (b) Laboratory Specialists of Michigan for UDTs provided to patients at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

### e)     Tessy C. Jenkins, M.D.

78.     Jenkins is a resident and citizen of the state of Michigan

79.     Jenkins has been a licensed physician in Michigan since 1996.

80.     Jenkins is a neurologist who purports to interpret the ambulatory EEG results for Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

81.     Jenkins testified that Maffia set up the arrangement with her to interpret the ambulatory EEGs for Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists.

82.     To facilitate the fraud scheme, Jenkins provides the Clinic Defendants an EEG report, purporting to read and analyze the results of the ambulatory EEG. Although Jenkins' reports state that the ambulatory EEG was "medically necessary for the care, recovery, and rehabilitation due to MVA," Jenkins has conceded in

deposition testimony that this is stock language because she does not actually evaluate the patient or determine whether the referral is appropriate.

83.    To further facilitate the fraud scheme and address scrutiny from insurers, Jenkins authored a one-paragraph "Letter of Medical Necessity for EEG" for the Clinic Defendants.  This letter was then submitted to support the fraudulent referrals for the ambulatory EEGs.  Jenkins conceded in deposition testimony that this was a stock letter and did not address the medical necessity for EEGs for any specific patient.  Jenkins further conceded in deposition testimony that EEG referrals are not medically necessary for evaluating headaches, although that was the justification typically provided by the Physicians to refer patients for EEGs.

84.    From approximately October 2017 through 2020, Jenkins has knowingly submitted, or caused to be submitted, bills and supporting documentation that are fraudulent from Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists for ambulatory EEGs.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    First-Party Claims for Payment Under the No-Fault Act

85.    Under Michigan's No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally

connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle."  MCL §§ 500.3105, 3107(1)(a).

86.    During much of the time Defendants were submitting charges to State Farm Mutual, Michigan required private passenger automobile insurance companies to provide unlimited No-Fault Benefits for life, if all conditions of eligibility were met.

87.    For the reasons described herein, Defendants knew that the charges at issue in this complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and therefore were not owed.

### B.    Defendants' Fraudulent Treatment of the Patients

88.    From 2017 through the present, Defendants have acted in concert to carry on their scheme that focuses on high-cost procedures, namely ambulatory EEGs and UDTs.

89.    Each Defendant plays a different role that is essential to the success of the scheme.  The Management Group recruited the Physicians, and the Physicians facilitate the fraud scheme by referring patients for Diagnostic Tests regardless of whether they: (1) have any medical efficacy for patients with soft-tissue injuries; (2) were indicated based on the individual needs of the patient; and (3) would provide any benefit for the patient.

90.     As detailed below, instead of providing legitimate pain management services, the Physicians routinely refer patients for expensive medical services regardless of whether they were medically necessary for the patient.  These referrals exploit patients' No-Fault Benefits and provide financial gain for the Management Group, rather than providing the patients with medically necessary care to address their individual conditions.

### C.     Defendants' Fraudulent Referrals For Ambulatory EEGs

### 1.     Legitimate Use of Ambulatory EEGs

91.     EEG tests are used to detect abnormalities in the electrical activity of the brain.  Brain cells communicate with one another by producing electrical impulses.  An EEG measures this electrical activity.  Specifically, electrodes that are connected to a computer are placed on the scalp.  The computer converts the electrical impulses detected by the electrodes into patterns that can be seen on the computer screen and interpreted by a doctor.

92.     EEGs are typically performed to study seizures and sleep disorders, diagnose epilepsy, determine if a person is brain dead, and to check for problems following a loss of consciousness.

93.     Importantly, EEGs are not medically necessary for patients who solely experience headaches without any other neurological problems (such as seizures). The authoritative American Academy of Neurology has stated that EEGs are not

appropriate for diagnosing headaches and have no advantage in those circumstances over a clinical evaluation.

94.     Resting and other EEGs are routinely performed in hospitals or doctor's offices, and the tests typically take approximately one to two hours to perform. However, in limited situations, such as when EEGs are performed as part of a comprehensive epilepsy evaluation or in intensive care units to detect seizures in comatose patients with multiple medical problems (*e.g.*, diabetes, renal failure, and cardiac rhythm disturbances), they may be performed over a longer period, during which the patient is constantly monitored.

95.     After concluding that a resting EEG has not provided sufficient information to evaluate the patient, a medical provider may order an ambulatory EEG to provide additional information.  During an ambulatory EEG, the patient is connected to a portable EEG device in the physician's office and is sent home with the EEG equipment to record possible seizure activity overnight, after which the patient returns the equipment.  The data is then transferred to a reading station and is interpreted by the physician.  Patients are supposed to record any neurological disturbances that they experience during the ambulatory EEG, so that the data can be read in conjunction with patients' notes (enabling the medical provider to assess whether abnormalities in the data are actually indicative of neurological issues as

opposed to other factors, such as equipment malfunction). Ambulatory EEGs are typically conducted over one to two consecutive days.

96.     When billing for an ambulatory EEG with portable EEG equipment and no continuous monitoring, CPT billing code 95953 should be used. CPT code 95953 represents "Monitoring for localization of cerebral seizure focus by computerized portable 16 or more channel EEG, electroencephalographic (EEG) recording and interpretation, each 24 hours." By contrast, CPT code 95951 is the CPT code appropriate for attended video EEGs (*i.e.*, EEGs for which the patient is video-recorded and monitored by a medical professional while the EEG records the brain activity).

## 2.    Defendants' Fraudulent Ambulatory EEGs

97.     Since 2017, Defendants have billed State Farm Mutual more than $1,900,000 for ambulatory EEGs purportedly provided to at least 60 patients. To the extent they performed the ambulatory EEGs at all, the Clinic Defendants did not perform them because they were medically necessary for the patients. Instead, as detailed below, at the direction of the Management Group, the Physicians – who had no neurological training – referred patients for ambulatory EEGs without regard to medical necessity.

98.     To conceal that the referrals were fraudulent, the Management Group hired Jenkins, a neurologist, to author "EEG Reports" falsely stating the "testing

[was] medically necessary for the care, recovery, and rehabilitation due to MVA," even though she admitted in deposition testimony that she had no access to patient records and never interacted with the patients.  And, in addition to billing for medically unnecessary ambulatory EEGs, the Clinic Defendants submitted bills using CPT codes falsely representing that the ambulatory EEGs were recorded and monitored by medical personnel.

99.    First, the Physicians recommended ambulatory EEGs for patients without regard to medical necessity.  As described above, EEGs are not medically necessary for patients with soft-tissue injuries who do not exhibit unusual neurological symptoms.  Even if an EEG were appropriate for these patients, a resting, in-office EEG should be performed and deemed inadequate before an ambulatory EEG is recommended.  By contrast, the Clinic Defendants referred ambulatory EEGs for patients without sufficient clinical symptoms (such as signs of seizure activity, including marked loss of time).  At most, the Physicians documented headaches, which are not an indication for *any* EEG (even an initial in-office resting EEG) much less the more extensive ambulatory EEGs patients received.  Moreover, the Physicians recommended multi-day, ambulatory EEGs without first obtaining an in-office EEG.  These referrals were not made for the benefit of the patient, but to enable the Clinic Defendants to bill separately for each day.

100.   Second, to facilitate the fraud scheme, the Management Group hired Jenkins to create the fraudulent EEG reports and letters of medical necessity in support of the EEG bills.   Jenkins is a board-certified neurologist and the Management Group recruited her because her credentials in neurology would help lend legitimacy to the EEGs, conceal that the Physicians were making fraudulent referrals, and conceal that the EEGs were performed without providing a log for patients to track their neurological symptoms (a necessary step for correlating the data with the patients' neurologic symptoms).   Jenkins agreed to allow the Management Group to take advantage of her credentials to further the fraud scheme.

101.   Specifically, for patients receiving the ambulatory EEGs, Jenkins purports to read the results of the ambulatory EEG and author an EEG report. Jenkins' EEG reports state that the ambulatory EEG was "medically necessary for the care, recovery, and rehabilitation due to MVA."   But in deposition testimony, Jenkins has conceded that this is stock language because she does not actually evaluate the patient, have access to their medical records, or determine whether the referral is appropriate.

102.   To further facilitate the fraud scheme, Jenkins authored a one-paragraph "Letter of Medical Necessity for EEG" for the Clinic Defendants.   This letter is submitted to purportedly support the fraudulent referrals for the ambulatory EEGs.   Jenkins conceded in deposition testimony that this is a stock letter and does

27

not address the medical necessity for EEGs for any specific patient.  Jenkins further

conceded in deposition testimony that EEG referrals are not medically necessary

for evaluating ordinary headaches unaccompanied by other abnormal neurological

symptoms, although that is typically the justification provided by the Physicians to

refer patients for EEGs.

103.   Jenkins further testified that, although patients receiving ambulatory

EEGs are supposed to be given a log to track neurological events (such as seizures)

that occur while they are being monitored, the Clinic Defendants do not provide such

logs to patients, thus missing critical documentation that is relevant to patient care

(if in fact the EEGs had been ordered for any valid medical purpose).

104.   Finally, in addition to having patients undergo medically unnecessary

ambulatory EEGs and submitting fraudulent underlying records to conceal that the

referrals were not necessary, the Clinic Defendants also used fraudulent CPT codes

on the bills.  In an attempt to justify their exorbitant charges, the Clinic Defendants

submit bills for the ambulatory EEG fraudulently using the CPT code only

appropriate for video EEGs being monitored by a medical professional, even though

the medical records do not document that their ambulatory EEGs are either

monitored by a medical professional or video recorded.

105.  For example, Patient A.Y. was initially seen at Dearborn Pain

Specialists on December 15, 2027 by Shukr.  During a subsequent visit with Shukr

on April 6, 2018, Patient A.Y. did not describe any unusual neurological symptoms at either visit that would warrant a resting EEG, much less a multi-day ambulatory EEG. Nonetheless, Shukr referred her for an ambulatory EEG "for traumatic headache," which is not a medically valid basis. Although it was not indicated for Patient A.Y., this referral enabled Dearborn Pain Specialists to submit $28,500 in charges. To justify the exorbitant charge, Dearborn Pain Specialists submitted bills for the ambulatory EEG falsely using the CPT code appropriate for video EEGs being contemporaneously monitored, even though there is no indication, in the underlying treatment records for Patient A.Y. or otherwise, that the ambulatory EEG for Patient A.Y. was either monitored by a medical professional or video recorded.

106. To justify the referral, Dearborn Pain Specialists also submitted the stock, one-paragraph "Letter of Medical Necessity for EEG" for ambulatory EEGs authored by Jenkins. This letter did not specifically address why Patient A.Y.'s individual medical history warranted an EEG.

107. Patient T.C. was initially seen at Michigan Pain Management on July 12, 2018 by Madden. During a subsequent visit with Madden on August 10, 2018, Patient T.C. did not describe any unusual neurological symptoms at either visit that would warrant a resting EEG, much less a multi-day ambulatory EEG. Nonetheless, Michigan Pain Management referred him for an ambulatory EEG "due to headaches," which is not a medically valid basis. Although it was not indicated for

Patient T.C. this referral enabled Michigan Pain Management to submit $28,500 in charges.  To justify the exorbitant charge, Michigan Pain Management submitted bills for the ambulatory EEG falsely using the CPT code appropriate for video EEGs being contemporaneously monitored, even though there is no indication, in the underlying treatment records for Patient T.C. or otherwise, that the ambulatory EEG for Patient T.C. was either monitored by a medical professional or video recorded.

108.   To justify the referral, Michigan Pain Management also submitted the stock, one-paragraph "Letter of Medical Necessity for EEG" for ambulatory EEGs authored by Jenkins.  This letter did not specifically address why Patient T.C.'s individual medical history warranted an EEG.

109.   Patient A.L.T. was initially seen at Dearborn Pain Specialists on February 21, 2019 by Ibraheim.  Patient A.L.T. did not describe any unusual neurological symptoms at his initial visit that would warrant a resting EEG, much less a multi-day ambulatory EEG.  Nonetheless, Ibraheim referred her for an ambulatory EEG "if headache persists," which is not a medically valid basis.  Although it was not indicated for Patient A.L.T., this referral enabled Dearborn Pain Specialists to submit $28,500 in charges.  To justify the exorbitant charge, Dearborn Pain Specialists submitted bills for the ambulatory EEG falsely using the CPT code appropriate for video EEGs being contemporaneously monitored, even though there is no indication, in the underlying treatment records for Patient A.L.T. or otherwise,

that the ambulatory EEG for Patient A.L.T. was either monitored by a medical professional or video recorded.

110.   To justify the referral, Dearborn Pain Specialists also submitted the stock, one-paragraph "Letter of Medical Necessity for EEG" for ambulatory EEGs authored by Jenkins.  This letter did not specifically address why Patient A.L.T.'s individual medical history warranted an EEG.

111.   Sample treatment records for patients who underwent EEGs are attached hereto as Exhibit 3.  The bills related to the sample EEG records are attached hereto as Exhibit 4.

### D.   Defendants' Fraudulent Referrals for UDTs

#### 1.   Legitimate Use Of Urine Drug Tests (UDTs)

112.   When patients seek treatment for pain, a licensed professional must obtain a history and perform an examination to arrive at a legitimate diagnosis and, based on that diagnosis, then engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique needs of each patient.

113.   Depending on the individual patient's history, physical exam, and diagnosis, the prescription of medication may be appropriate to alleviate pain. However, opioid pain medication presents serious risks, including addiction, overdose, and complications resulting from interactions with other drugs.

114.   UDTs can provide information to a medical provider that is critical in assessing whether drug prescriptions, including opioid prescriptions, are appropriate for a particular patient.  First, UDTs can reveal that a patient is using either illicit or lawful drugs that the patient has not reported taking to the medical provider, and thus any opioid prescription may be contraindicated until those issues are resolved.  This is important because the risk for overdose increases when one opioid is combined with other opioids or benzodiazepines, as well as illicit drugs like heroin and cocaine.  Second, UDTs can reveal when patients are not taking drugs prescribed for them, which can indicate that the patient may be diverting or illegally reselling the drugs, such as opioids.

115.   Thus, particularly given the severity of the opioid crisis and the serious risks of opioid usage to patients who have been prescribed opioids (or possibly to third parties who take opioids that are diverted or resold by patients), medical providers must ensure that red flags detected on a UDT are integrated into the patient's medical care.

116.   Two types of UDTs are typically used by medical providers in a clinical setting, namely, a qualitative/presumptive UDT ("presumptive UDT") and a quantitative/confirmatory UDT ("confirmatory UDT").  A presumptive UDT indicates whether a particular drug and/or its metabolites are present in the specimen, but does not indicate the specific concentration of that drug.  Thus, results

of a presumptive UDT are reported as "positive" or "negative."  By contrast, the results of a confirmatory UDT reveal the specific concentration of the metabolites of a particular drug.

117.   The Centers for Disease Control and Prevention published Guidelines for Prescribing Opioids for Chronic Pain ("CDC Guidelines"), which also provide guidance on referrals for UDTs.  The CDC Guidelines explain that referrals for confirmatory UDTs should be based on a particular need to detect specific drugs that cannot otherwise be identified on standard presumptive UDTs or in situations where the presumptive UDTs show unexpected results.

118.   The CDC Guidelines further instruct that before ordering any UDTs, medical providers "should have a plan for responding to unexpected results." Moreover, medical providers "should not test for substances for which results would not affect patient management or for which implications for patient management are unclear."  *See* Ex. 5.[1]

119.   As set forth below, the Physicians failed to adhere to the CDC Guidelines and also failed to adhere even to fundamental concepts pertaining to the proper ordering and use of UDTs.  Instead, the Physicians ordered UDTs without

---

[1] Dowell D, Haegerich TM, Chou R.  CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016.  http://dx.doi.org/10.15585/mmwr.rr6501e1.  September 26, 2022.

engaging in legitimate decision-making and without appropriately documenting or considering the need for the opioids or UDT results.

### 2.    Defendants' Fraudulent Referrals For UDTs

120.   As noted above, when ordered in a legitimate setting, UDTs can provide information to a medical provider that is critical in assessing whether opioid drug use is appropriate for a particular patient.  First, UDTs can reveal that a patient is using either illicit or lawful drugs that the patient has not reported taking to the medical provider.  Second, UDTs can reveal when patients are not taking opioids prescribed for them, which can indicate that the patient is diverting or illegally reselling the opioids prescribed for that patient.  Both would be "red flags" that should be addressed and integrated into the patient's treatment plan.

121.   Importantly, given the numerous risks to patients (and others) that flow from the prescriptions of opioids, medical providers prescribing these medications must ensure adequate compliance and rule out contraindications through responsible, medically necessary UDT testing that (1) appropriately tests for important substances, (2) with the correct tests, (3) with appropriate frequency, and (4) considers the results of the tests with respect to patient care and safety.

122.   By contrast, the Physicians here order UDTs not because they are clinically indicated for the patient or because they intend to use the results to make legitimate medical decisions for the patients, such as reassessing the patients'

34

treatment plans or determining whether the medications prescribed to the patients are being used or are necessary. Instead, the Physicians: (1) order UDTs as a matter of course; (2) order presumptive and confirmatory UDTs simultaneously, with no individualized determination of the need or nature of any confirmatory UDTs; (3) order an unjustifiably extensive panel for the confirmatory UDTs; and (4) routinely ignore UDT results that are red flags and could implicate patient safety and care.

**a)    Defendants Refer Patients For UDTs As A Matter Of Course To Maximize Profits**

123. Although UDTs can provide relevant information to a medical provider assessing whether a patient is abusing or misusing prescription drugs, UDTs are not medically necessary for all patients. To determine whether a patient needs an initial UDT or repeat UDTs, a provider must consider the patient's unique medical history and then engage in medical decision-making to determine whether a UDT is medically necessary on a particular visit. These considerations include, but are not limited to, whether the patient has a history of abusing prescription or illicit drugs or whether the patient is being prescribed drugs, such as drugs that pose serious risks of overdose resulting from interactions with other drugs.

124. At the Clinic Defendants, the Physicians order UDTs, regardless of whether the patient is taking or being prescribed opioids (or any medications that might require routine monitoring). Moreover, the Physicians continue to refer the patient for additional UDTs at subsequent visits, regardless of whether the results

of the prior UDTs suggest that the patient is misusing prescription or illicit drugs. Tellingly, the Physicians typically do not indicate why a UDT is ordered for a particular patient.

125.   For example, Patient H.T. treated at Michigan Pain Management from approximately June 2020 until at least January 2022.  Michigan Pain Management records reflect Patient H.T. was not prescribed opioids during this time and nothing in the records provides any basis for ordering UDTs.  Nonetheless, the Physicians referred Patient H.T. for more than fifteen UDTs and enabled Laboratory Specialists of Michigan to bill State Farm Mutual more than $47,000.  Notably, the requisition form for four of these UDTs did not even designate which substances should be tested.  Nonetheless, Laboratory Specialists of Michigan ran the same expansive panel covering twenty-four substances for all of the UDTs for Patient H.T.

126.   Patient L.M.F. treated at Michigan Pain Management from October 2020 until at least June of 2022.  She was not prescribed opioids by Michigan Pain Management until February of 2022 when she had been receiving treatment for well over a year.  Nevertheless, the Physicians referred patient L.M.F. for more than fifteen UDTs throughout her course of treatment and enabled Laboratory Specialists of Michigan to bill State Farm Mutual more than $48,000.  Notably, the Physicians checked a box to test for "all drugs" on all but seven requisition forms despite a complete lack of justification for such an extensive panel.  On six of those forms

without the "all drugs" box checked, the Physician still marked all or nearly all substances for screening.  Moreover, while one form had nothing marked, the UDT still tested for all the substances available.  Patient L.M.F. also tested positive for multiple substances on every UDT, but the Michigan Pain Management records never address this fact.

127.  Patient L.W. treated at Michigan Pain Management from June 2021 until at least May of 2022.  Nothing in the records provides any basis for ordering UDTs.  Despite these facts, the Physicians referred patient L.W. for more than ten UDTs and enabled Laboratory Specialists of Michigan to bill State Farm Mutual more than $21,000.  Notably, the Physicians checked the box indicating that the UDTs should test "all drugs" on every single requisition form despite a complete lack of justification for such an extensive panel.

128.  Patient J.U. treated at Michigan Pain Management from April 2018 until October 2019.  Although she was prescribed opioids at the beginning of her treatment, these stopped being prescribed after September 2018.  Nonetheless, the Physicians referred Patient J.U. for six UDTs starting in November 2018 and enabled Laboratory Specialists of Michigan to bill State Farm Mutual more than $20,000.  Notably, the requisition form for five of the six confirmatory UDTs did not even designate which substances should be tested.  Moreover, the one requisition form that specified the substances, only checked off nine of them, and

Laboratory Specialists of Michigan still tested for the full list of substances. Ultimately, Laboratory Specialists of Michigan ran expansive panels covering more than 20 substances for all of the confirmatory UDTs for Patient J.U.

129.   This type of predetermined, automatic ordering of UDTs demonstrates the Physicians are not performing, as they should, individualized medical decision-making based on each patient's unique needs.  Instead, they are ordering tests for financial reasons, and, as described herein, their misuse of these tests, and disregard of the results therein, show the true purpose of this testing is for Defendants' financial gain, not to address the patients' medical needs.

### b) Defendants Order Presumptive And Confirmatory UDTs Simultaneously To Maximize Profits

130.   As described above, it is not medically appropriate to automatically refer patients for confirmatory UDTs.  According to the CDC Guidelines, referrals for confirmatory UDTs should not be routine.  Instead, confirmatory UDTs should be based on a particular need to detect specific opioids that cannot otherwise be identified on standard presumptive UDTs or in situations where the presumptive UDTs show unexpected results.

131.   By contrast, the Physicians refer patients for confirmatory UDTs as a matter of course, simultaneously ordering presumptive UDTs and confirmatory UDTs at most dates of service.  There is no medical basis for automatically referring patients for confirmatory UDTs.  Moreover, Defendants' practice of automatically

ordering confirmatory UDTs highlights that the Physicians never intended to rely on the results of the presumptive UDTs at the outset.

132.   Consequently, the presumptive UDTs for numerous patients ordered by the Physicians reveal no red flags for the substances tested on the confirmatory panel.  As a consequence, the Physicians routinely order confirmatory UDTs when the presumptive UDT results are not unexpected.

133.   Tellingly, in addition to failing to indicate why a presumptive UDT is ordered, the Physicians do not provide an explanation of *why* a confirmatory UDT is ordered.  In fact, although patients typically receive both a presumptive UDT and a confirmatory UDT, the Physicians do not typically even document that they ordered both a presumptive UDT and a confirmatory UDT.

134.   For example, Patient E.W. treated with Michigan Pain Management from August 2019 until January 2021.  During this time, the Physicians referred Patient E.W. for more than 20 presumptive and confirmatory UDTs.  The records for Patient E.W. did not document why she required such extensive testing, much less why it was medically appropriate to receive more than 20 presumptive and confirmatory UDTs.  Notably, only five of the requisition forms indicated which substances should be tested.  The remainder were all left blank.  Nonetheless, these referrals allowed Laboratory Specialists of Michigan to submit more than $73,000 in charges to State Farm Mutual.  In fact, these referrals enabled Laboratory

Specialists of Michigan to charge more than $20,000 for the presumptive tests alone.  As described above, patients were simultaneously referred for presumptive and confirmatory tests; thus, these presumptive tests were not actually relied upon to determine whether a confirmatory test was necessary and what substances actually needed a confirmatory test.

135.  This type of predetermined, automatic ordering of extensive confirmatory tests without any clinical rationale demonstrates that the Physicians are not performing, as they should, individualized medical decision-making based on each patient's unique needs.  Instead, they are ordering these tests for financial reasons, and, as described herein, their misuse of these tests, and disregard of the results therein, shows the true purpose of this testing is for Defendants' financial gain, not to address the patients' unique medical needs.

> **c)   Defendants Order Unreasonably Extensive Confirmatory Panels To Maximize Profits**

136.  As described above, a patient's unique history and needs may warrant a referral for a confirmatory UDT on a particular visit (such as when a presumptive UDT shows unexpected results for a patient with a history of substance abuse disorder).  A confirmatory UDT can test for a single substance or multiple substances, depending on the instructions from the referring provider.  In a legitimate setting, after concluding that confirmatory testing is appropriate, the

medical provider would then select a subset of substances that should receive the more robust testing.

137.   Here, by contrast, the Physicians almost always order unnecessarily extensive panels for the confirmatory UDTs, regardless of the patient's unique circumstances (such as the results of the presumptive UDTs).  *See* Ex. 2.  These extensive panels test for more than 20 substances, including three anti-depressants, which would have no bearing on the treatment plans for the typical patients with soft-tissue injuries.

138.   Such extensive panels are not selected because they are medically necessary for patients.  Instead, by ordering or causing such extensive panels to be ordered, Defendants maximize profits because Laboratory Specialists of Michigan bills separately for each substance tested.  When the charge for each drug on the panel is added to the charge for the presumptive test, the final bill from the Laboratory Specialists of Michigan is $3,000–$4,000 for each date of service.

### d)   Defendants Ignore Red Flags That Could Implicate Patient Care And Safety

139.   The Physicians do not typically consider or integrate the results of the UDTs into the patient's treatment.  Such analysis would be especially important for patients with red flags in their UDT reports, (*i.e.*, patients who test negative for prescribed medications; or patients who test positive for illicit drugs or drugs that were not prescribed), because these results could indicate serious contraindications

41

for continued opioid prescriptions and could implicate serious patient safety risks, including the safety of others if the test results suggest that the patient may be diverting or even selling prescribed opioids to individuals not under medical care.

140.   Here, numerous patients who received UDTs had at least one UDT result suggesting the patient was: (1) not taking the medication as prescribed; (2) taking medication that was not prescribed; and/or (3) taking an illicit substance. Yet, the Physicians almost never note that these patients had any unexpected UDT results, much less analyze and document the significance of the unexpected UDT result, which is important in determining whether the patients should continue receiving additional medication.

141.   For example, Patient A.D.P. treated at Dearborn Pain Specialists from May 2018 through at least June 2021.  During that time, the Physicians (including Shukr and Ibraheim) referred him for more than 20 UDTs at Laboratory Specialists, each of which resulted in significant red flags.  In fact, during his course of treatment, Patient A.D.P. tested positive for fentanyl on each of the UDTs.  In addition to testing positive for fentanyl on each UDT, he also tested positive for heroin on more than ten occasions and tested positive for heroin and cocaine on three occasions.  But the Physicians ignored these red flag results during his treatment, only acknowledging that there was a red flag on a UDT after more than two years of treatment (and even then, the examination report only notes that he

tested positive for cocaine, when, in fact, he tested positive for: (1) cocaine, (2) heroin, (3) codeine, (4) fentanyl, (5) gabapentin, (6) hydromorphone, (7) morphine (8) tramadol (an opioid), and (9) Norquetiapine (an antipsychotic)).  During this time, the Physicians also consistently prescribed hydrocodone for Patient A.D.P., eventually raising the dosage despite the alarming UDT results.

142.   Specifically, Patient A.D.P. was referred to Laboratory Specialists of Michigan for a presumptive and confirmatory UDT on October 18, 2018. According to the report from that UDT, Patient A.D.P. tested positive for, among other things, heroin, fentanyl, and tramadol (also an opioid) on the confirmatory UDT.  When Patient A.D.P. was seen at his next office visit on November 15, 2018, Ibraheim did not acknowledge, much less act on these troubling results.  Instead, he prescribed hydrocodone for Patient A.D.P. and ordered another UDT from Laboratory Specialists of Michigan.  According to the report from November 15, 2018, Patient A.D.P. once again tested positive for codeine, fentanyl, morphine, and tramadol on the confirmatory UDT.  He did not test positive for hydrocodone (the opioid he was prescribed at his prior visit).  When Patient A.D.P. was seen at his next office visit on December 12, 2018, Ibraheim did not acknowledge, much less act on these troubling results  Instead, he ordered another UDT at Laboratory Specialists of Michigan.  In fact, Ibraheim ordered more than ten UDTs between October 2018 and March 2020.  On each of these, Patient A.D.P. tested positive for

a combination of fentanyl and other drugs (including benzodiazepines and heroin),
but these alarming red flags were not acknowledged, much less integrated into the
records.

143.   Although many of the examination reports noted that Patient A.D.P.
would be "weaned" from the hydrocodone the Physicians were prescribing, this did
not occur.   To the contrary, despite Patient A.D.P.'s history of alarming UDT
reports, Padula actually prescribed hydrocodone with an increased dosage in
January 2020.

144.   Shukr treated Patient A.D.P. from April 2020 through at least May
2021, during which time he ordered at least ten UDTs at Laboratory Specialists of
Michigan.   On these UDTs, Patient A.D.P. tested positive for a combination of
fentanyl, heroin, and at least four other substances.   Shukr did not acknowledge any
of these red flags.   Instead, he continued prescribing Patient A.D.P. hydrocodone
and sending him to Laboratory Specialists of Michigan for UDTs.

145.   Patient D.J.D. treated with Michigan Pain Management from January
2019 until at least November 2021.   During that time, he was seen at least thirty
times for office visits and was referred to Laboratory Specialists for presumptive
*and* confirmatory UDTs at nearly every office visit.   Notably, there were 25
requisition forms in the patient's medical records and only six of those forms
identified the substances that should be tested.   The Physicians never acknowledged

the results of the UDTs in their records and, in fact, ignored red flag results that appeared on numerous UDTs over the course of treatment.  Specifically, from March 2019 until the end of treatment, the office examination records from Michigan Pain Management did not indicate that Patient D.J.D. was prescribed hydrocodone, but Patient D.J.D. tested positive for hydrocodone (or norhydrocodone) on every single UDT administered during this time period.  In addition, Patient D.J.D. also tested positive for oxycodone (in addition to hydrocodone) on October 15, 2019 and November 7, 2019, even though the records from Michigan Pain Management do not indicate that he was prescribed this drug. Each of these red flags indicates Patient D.J.D. may have been taking drugs that were obtained illicitly and not under the supervision of a medical professional.  In a legitimate practice, a medical provider would acknowledge and integrate each of these red flag results into the patient's treatment.  By contrast, the Physicians never acknowledged, much less integrated the results into Patient D.J.D.'s medical evaluations.  Nonetheless, the referrals from Michigan Pain Management enabled Laboratory Specialists to bill State Farm Mutual more than $100,000 for these UDTs.

146.   Patient D.N. treated with Michigan Pain Management from February 2019 until at least January 2022.  During that time, Patient D.N. was seen at least 25 times for office visits and was referred to Laboratory Specialists of Michigan for

both presumptive and confirmatory UDTs on at least 20 occasions.  Notably, only half of the requisition forms for this patient were filled out indicating which substances should be tested.  The Physicians at Michigan Pain Management never acknowledged the results of the UDTs in their records, routinely ignoring red flag results on numerous UDTs.  In fact, although Michigan Pain Management did not prescribe Patient D.N. hydrocodone, Patient D.N. tested positive for hydrocodone (or one of its metabolites) on at least 15 of the UDTs administered during the course of treatment.  In any legitimate practice, a provider would acknowledge these results as red flags because they indicate the patient may be taking drugs that were obtained illegally.   The Physicians did not acknowledge these red flags.   Instead, the Physicians continued to refer Patient D.N. to Laboratory Specialists of Michigan for testing and continued to ignore the results.

147.  Patient S.C. began treatment with Dearborn Pain Specialists and Laboratory Specialists of Michigan from December 2018 to November 2019. During that time, Patient S.C. was seen at least nine times for office visits at Dearborn Pain Specialists, which referred him to Laboratory Specialists of Michigan for both presumptive and confirmatory UDTs on at least six occasions. Notably, none of the requisition forms were filled out to indicate which substances should be tested.  Again, the Physicians at Dearborn Pain Specialists repeatedly ignored red flag results.  First, although the Physicians did not previously prescribe

Patient S.C. hydrocodone, he tested positive for hydrocodone on a UDT administered on March 7, 2019. But, at Patient S.C.'s subsequent office visit on March 18, 2019, the Physicians did not acknowledge that Patient S.C. tested positive for an opioid he was not being prescribed, much less integrate that red flag result into his treatment. In addition, despite this red flag, Ibraheim prescribed Patient S.C. hydrocodone during the patient's April 19, 2019 visit to Dearborn Pain Specialists.

148. Patient F.L.W. received treatment from Dearborn Pain Specialists and Michigan Pain Management between January 2019 and at least January 2022. During that time, she was seen at least 40 times for office visits and was referred to Laboratory Specialists for presumptive and confirmatory UDTs on at least 35 occasions. Notably, less than half of the requisition forms for this patient were filled out indicating which substances should be tested. The Physicians never acknowledged the results of the UDTs and, in fact, ignored red flag results that appeared throughout the course of treatment. Specifically, on a UDT administered on March 11, 2019, Patient F.L.W. tested positive for hydrocodone, even though records from Michigan Pain Management do not indicate that she was prescribed this narcotic. At her next office visit on May 10, 2019, the Physicians did not acknowledge this red flag, but instead prescribed Patient F.L.W. oxycodone with acetaminophen. At a UDT administered on June 11, 2019, Patient F.L.W. again

tested positive for hydrocodone and also tested positive for morphine, even though records from Michigan Pain Management do not indicate that she was prescribed these drugs. However, she did not test positive for oxycodone with acetaminophen, which Michigan Pain Management did prescribe. On her next office visit on July 9, 2019, the Physicians failed to acknowledge the patient was taking drugs she was not being prescribed and not taking drugs that were prescribed. On a UDT administered on August 6, 2019, Patient F.L.W. tested positive for oxycodone, even though records from Michigan Pain Management do not indicate that she was prescribed this drug at her previous visit. At her next office visit on August 22, 2019, the Physicians did not acknowledge this red flag in the patient's records; instead, they ordered yet another UDT only 16 days after the previous UDT. At the UDT administered on August 22, 2019, Patient F.L.W. again tested positive for oxycodone, even though records from Michigan Pain Management do not indicate that she was prescribed this drug for several months. Once again, at her next office visit on September 4, 2019, the Physicians did not acknowledge this red flag in the patient's records. On a UDT administered on November 1, 2019, Patient F.L.W. tested positive for butalbital (a barbiturate), even though records from Michigan Pain Management do not indicate that she was prescribed this drug. At her next office visit on November 15, 2019, the Physicians did not document that she tested

positive for a barbiturate, which causes respiratory depression.   Instead, they prescribed Patient F.L.W. hydrocodone, which also causes respiratory depression.

149.   Patient E.W.J. treated with Michigan Pain Management from September 2019 through at least December 2021.   During that time, he was referred to Laboratory Specialists for presumptive and confirmatory UDTs on more than 20 occasions.   Notably, on twelve of the requisition forms the substance to be tested portion was left blank.   The Physicians never acknowledged the results of the UDTs and, in fact, ignored red flag results that appeared on UDTs over the course of nearly two years.   Specifically, a report from an October 28, 2019 UDT indicated patient E.W.J. tested positive for hydrocodone despite not being previously prescribed this drug.   When he was seen by Shukr on November 14, 2019, the Physician did not comment on this red flag.   Instead, Shukr sent him for another UDT.   On the UDT administered on November 14, 2019, Patient E.W.J. tested positive for marijuana, oxycodone, and oxazepam (a sedative).   Despite the risks of taking opioids with a sedative, at his office visit on November 27, 2019, the Physicians did not acknowledge this red flag in the patient's records.   Instead, Shukr ordered another UDT.   Additionally, Patient E.W.J. tested positive for marijuana on all but one UDT.   As noted above, Laboratory Specialists of Michigan billed separately for the substances tested.   Thus, based on the referrals from the Physicians, Laboratory Specialists of Michigan billed separately to test for marijuana on more than nineteen

separate occasions.  Although the Physicians provided the referrals that enabled these charges, the Physicians never commented on the UDTs that were positive for marijuana.

150.   Although the Physicians routinely ignored and routinely failed to integrate the UDT results into patient treatment plans or records, the referrals from Michigan Pain Management and Dearborn Pain Specialists enabled Laboratory Specialists to bill State Farm Mutual more than $2.5 million for UDTs.

151.   Sample treatment records for patients who underwent UDTs are attached hereto as Exhibit 6.  The bills related to the sample UDT records are attached hereto as Exhibit 7.

### 3.   The Referrals To Laboratory Specialists of Michigan Violated Michigan's Prohibition Against Self-Referrals To Labs

152.   The Michigan Public Health Code prohibits health care providers from referring patients for designated health care services to any entity in which the health care provider has a financial relationship, unless an exemption applies.  *See* MCL § 333.16221(e)(iv)(B); *see also* MCL § 333.16221(e)(iii) (prohibiting "[p]romotion for personal gain of an unnecessary drug, device, treatment, procedure, or service"); MCL § 333.16221(h) (prohibiting "[a] violation, or aiding or abetting in a violation, of this article or of a rule promulgated under this article").

These prohibitions apply regardless of the source of payment for the health services. *See* MCL § 333.16221(e)(iv)(B).

153. The policy rationale behind these prohibitions on self-referrals is that medical treatment should be guided solely by the patient's legitimate medical needs, and physicians should not recommend services based on personal financial gain rather than medical necessity. By prohibiting physicians from referring to facilities in which the physician has a direct or indirect financial interest, the Michigan Public Health Code (and the Federal Stark law) seek to reduce medically unnecessary services based on financial motives as opposed to patient needs and eliminate financial factors that may interfere with a provider's independent medical judgment.

154. Designated health services include clinical laboratory services, including UDT tests. *See* MCL § 333.16221(e)(iv)(B) (which incorporates the federal self-referral statute).

155. A "financial relationship" includes any ownership, investment, or compensation arrangement between the physician and the entity providing the designated health service. *See* MCL § 333.16221(e)(iv)(B) (which incorporates the federal self-referral statute); *see also* 42 USC § 1395nn(a)(2). An ownership or investment interest may be through equity, debt, or other means, and includes an

interest in an entity that holds an ownership or investment interest in any entity providing the designated health service.  *Id.*

156.   Moreover, a physician cannot circumvent the Stark law or the prohibitions in Michigan law by directing a physician under his or her control to make a referral.  Under the Stark law and Michigan law, which incorporates the federal Stark Law, "Referring physician means a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made by another person or entity."  42 C.F.R. § 411.351.

157.   Thus, under Michigan law, a physician may not refer patients for lab testing – or direct others to order lab testing – to a lab in which the physician has an ownership interest unless a statutory exemption applies.

158.   Here, the Physicians referred patients at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialists to Laboratory Specialists of Michigan for UDTs.  These referrals were made directly by Padula or at the direction of Padula.  These referrals were made in violation of Michigan's self-referral prohibition because Padula has an ownership interest in Laboratory Specialists of Michigan.   Similarly, the referrals made by other physicians at Michigan Pain Management, Sterling Heights Pain Management, and Dearborn Pain Specialist violated Michigan's self-referral prohibition because the Physicians

were making referrals at Padula's direction and therefore his ownership interest is imputed to them for purposes of the prohibition.

159.   Because the UDT referrals were made in violation of Michigan's self-referral prohibition, none of these services was "lawfully render[ed]" under the No-Fault Act.  *See* M.C.L. § 500.3157 (only a "physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person" is entitled to payment).

160.   As a result, the charges submitted by Laboratory Specialists of Michigan were fraudulent because they represented that the UDTs were lawfully rendered when, in fact, the UDTs performed on patients referred by the Physicians were unlawful.

### E.   State Farm Mutual's Justifiable Reliance

161.   Defendants submitted, or caused to be submitted, medical records and bills falsely representing that the Clinic Defendants and Laboratory Specialists of Michigan provided services that were medically necessary and/or lawfully rendered when, in fact, they were not.

162.   State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.  The bills and supporting documents Defendants submitted, and caused to be submitted, to State Farm Mutual in support of the fraudulent charges at issue, combined with the material

misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

163.   Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual.  Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

164.   As a result, State Farm Mutual has incurred damages of more than $450,000 in No-Fault Benefits that it paid to Defendants.

## V.   CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

165.   State Farm Mutual incorporates, adopts, and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1–164 above.

166.   All Defendants formed an association-in-fact "enterprise" (the "Michigan Pain Fraudulent Billing Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engaged in, and the activities of which affected, interstate commerce.

167.   The members of the Michigan Pain Fraudulent Billing Enterprise were joined in a common purpose, had relationships with and among each other, and associated through time sufficient to permit those associated to pursue the enterprise's common purpose, which was to defraud State Farm Mutual and other insurers through fraudulent claims for No-Fault Benefits.

168.   Each Defendant needed and depended upon the participation of the other Defendants to accomplish their common purpose of defrauding State Farm Mutual (and possibly other insurers) through fraudulent claims for No-Fault Benefits.  Specifically,

(a) the Management Group members are the primary drivers of the fraud scheme and have implemented the fraud scheme through their ownership or control of the Clinic Defendants and Laboratory Specialists of Michigan and by recruiting the Physicians;

(b) the Physicians, including Padula, Shukr, Ibraheim, Tankha, and Madden, falsely purport or purported to perform legitimate examinations and to prescribe Diagnostic Tests because they were/are medically necessary, when, in fact, their examinations were/are not legitimate and these services were/are prescribed to maximize profits for the Management Group; and

(c) the Clinic Defendants and Laboratory Specialists of Michigan serve as the entities through which Defendants purportedly perform or performed the above-described services and submit, and caused to be submitted, to State Farm Mutual the bills and supporting documentation for these services.

169.   The participation and roles of each Defendant were/are necessary to the success of the scheme.  None of these Defendants was/is capable of carrying out the scheme without the participation of the others.

170.   Each Defendant has been employed by and/or associated with the Michigan Pain Fraudulent Billing Enterprise.

171.   Each Defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the Michigan Pain Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit to State Farm Mutual (and possibly other insurers) hundreds of fraudulent claims for services that were medically unnecessary or were not performed, which are described in the RICO Events on Exhibits 1–2 attached hereto.  Sample treatment records and bills are attached hereto as Exhibits 3–4, 6–7.  The false statements of material fact include that:

(a) the Physicians referred patients for Diagnostic Tests because they were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(b) the Diagnostic Tests were performed because they were medically necessary, when in fact, they were not; and

(c) the UDTs were lawfully rendered when, in fact, they were not.

172.   By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $450,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants, compensatory damages, together with treble damages, costs and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

173.    State Farm Mutual incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1–164 above.

174.    Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Michigan Pain Fraudulent Billing Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual (and possibly other insurers) hundreds of fraudulent claims for services which were medically unnecessary or were not performed.

175.    The charts attached hereto as Exhibits 1–2 summarize bills that Defendants submitted, and caused to be submitted, to State Farm Mutual in furtherance of their mail fraud scheme.

176.    Defendants agreed to and acted in furtherance of the common and overall objective of the conspiracy, to defraud State Farm Mutual and other insurers, through the roles and conduct described in Paragraphs 166–171 above.

177.    By reason of the above-described conduct, State Farm Mutual has been injured in its business and property in that it has paid more than $450,000 to Defendants based upon the fraudulent charges.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**COMMON LAW FRAUD**
**<u>(Against All Defendants)</u>**

178.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1–164 above.

179.    Defendants intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related documentation for services that were either not performed, or were not performed because they were medically necessary to address the unique needs of patients.

180.    The false statements of material fact include that:

(a) the Physicians referred patients for Diagnostic Tests because they were medically necessary to address the unique needs of each patient, when, in fact, they did not;

(b) the Diagnostic Tests were performed because they were medically necessary, when in fact, they were not; and

(c) the UDTs were lawfully rendered when, in fact, they were not.

181.   Defendants knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

182.   Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

183.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $450,000 in No-Fault Benefits paid to Defendants.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just and proper.

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Against All Defendants)

184.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1–164 above.

185.   State Farm Mutual conferred a benefit upon Defendants by paying their claims and Defendants voluntarily accepted and retained the benefit of those payments.

186.   Because Defendants knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation for services that were not

performed, or were unlawfully rendered, or were not performed because they were medically necessary, circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

187.    As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $450,000.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## FIFTH CAUSE OF ACTION
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (Against the Clinic Defendants and Laboratory Specialists of Michigan)

188.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1–164 above.

189.    This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

190.    An actual case and controversy exists between State Farm Mutual, on one hand, and the Clinic Defendants, on the other hand, as to all charges for Diagnostic Tests ordered by the Physicians that have not been paid.  State Farm Mutual contends that the Clinic Defendants are not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

191. An actual case and controversy exists between State Farm Mutual, on one hand, and Laboratory Specialists of Michigan, on the other hand, as to all charges for UDTs ordered by the Physicians that have not been paid. State Farm Mutual contends that Laboratory Specialists of Michigan is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

192. Because the Clinic Defendants and Laboratory Specialists of Michigan have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to State Farm Mutual, they are not entitled to any reimbursement for any unpaid claims and charges for services performed pursuant to the fraud scheme submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring that the Clinic Defendants and Laboratory Specialists of Michigan are not entitled to reimbursement for any of the unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

State Farm Mutual also respectfully seeks supplementary relief, attorneys' fees, interest, and costs, as this Court deems equitable, just, and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated: May 19, 2023

Respectfully submitted,

By: */s/ Ross O. Silverman*
     Ross O. Silverman (IL 6226560)
     Eric T. Gortner
     KATTEN MUCHIN ROSENMAN LLP
     525 West Monroe Street, Suite 1900
     Chicago, IL  60661-3693
     (312) 902-5200
     ross.silverman@kattenlaw.com
     eric.gortner@kattenlaw.com

     Thomas W. Cranmer (P25252)
     Matthew P. Allen (P57914)
     Caroline B. Giordano (P76658)
     MILLER, CANFIELD, PADDOCK
       And STONE, P.L.C.
     840 W. Long Lake Road, Suite 150
     Troy, MI 48098
     (248) 267-3381
     cranmer@millercanfield.com
     allen@millercanfield.com
     giordano@millercanfield.com

     *Attorneys for Plaintiff State Farm*
     *Mutual Automobile Insurance Company*